ELLIS, Judge.
Plaintiff was employed on January 25, 1953 by T. W. Kleinpeter Construction Company as a manual laborer, and on March 23, 1953 he was in between a winch truck and a heater truck preparing to attach a cable from one to the other when one of the vehicles rolled backwards crushing his abdomen and lower chest between the two.
Workmen’s compensation was paid through May 31, 1953, discontinued, and after demand and discussion between plaintiff’s counsel and representatives of the insurer, the compensation was resumed retroactively and paid through October 19, 1953. The present suit was filed in November 1953 seeking compensation for total and permanent disability not exceeding 400 weeks with credit for compensation paid, the usual interest together with medical allowances and attorney fees and the penalty under LSA-R.S. 22:658.
Judgment was rendered in favor of the plaintiff awarding compensation in the amount of $22.10 per week not to exceed 400 weeks, with the usual interest and credit for compensation previously paid and medical fees. The' penalties prayed for were denied. •
.. From this judgment the defendants have appealed and the plaintiff has answered the appeal asking that the unexpended medical allowances be increased and awarded in ,a lump sum instead of reserving to plaintiff-appellee his right to subsequently sue for this unexpended medical allowance, and further asking that the plaintiff-appellee be allowed full statutory penalties under the provisions of LSA-R.S. 22:658.
There is no dispute as to plaintiff’s employment, his wage rate, the hazardous nature of the job, the occurrence of the accident, or the fact that plaintiff was disabled as a result thereof. The question presented concerns the plaintiff’s present condition, whether or not he is disabled, and whether his disability can be attributed to the accident which occurred on March 23, 1953.
It is shown that plaintiff was 52 years of age at the time of the trial, had never gone to school a day in his life, had moved from Missouri to Baton Rouge in 1952.
After the injury plaintiff was removed to a hospital in Baton Rouge where he was seen by Dr. 'Chester A. Williams who was on general traumatic call. Dr. Williams testified that he was in the: Baton Rouge General Hospital at the time plaintiff was brought in and saw him approximately 30 minutes after the accident. He stated that when he first saw plaintiff he was complaining of pain in his abdomen and the lower part of his chest, particularly in the right side, and in his right lumbar area, and he had some general contusions over the right lumbar area as well as some tenderness over, the last two ribs on the right side. Dr. Williams summed up plaintiff’s complaints as being limited to the abdomen and right lumbar area. He had X-rays made which showed fractures of the seventh, eighth and ninth ribs on the right side, and a pyelogram made later showed some healing fractures of the tenth and eleventh ribs on the same side. The X-rays of plaintiff’s lumbar sacral spine were .taken on March 23, and showed no evidence of fracture or *368 dislocation of the lumbar spine or pelvis. This X-ray had incidental findings of hypertrophy in the lumbar vertebrae bodies and narrowing of the discs between the fourth and fifth lumbar vertebrae and calcification in the wall of the abdominal aorta. Dr. Williams, also had a picture made of his right upper arm which was negative, and a flat plate made of the abdomen and an upright plate and there were no abnormalities demonstrated on the X-ray in the abdomen except incidental finding of the fracture of the rib on that same film.
After plaintiff was admitted to the hospital this doctor gave him general supportive treatment and he developed a rather severe ileus, which is a condition affecting the bowel. Dr. Williams was concerned as to whether plaintiff might not have an injury to his right kidney as there were streaks of blood in his urine, however, he testified that his kidney continued to function and no further trouble developed.
Plaintiff stayed in the hospital nine days and was discharged on the thirty-first of March. After this, Dr. Williams saw him in his office during April and May and he discharged plaintiff on May 29th. In testifying as to plaintiff’s condition as of May 29th, Dr. Williams stated:
“When I discharged him on May 29th, I went over him pretty well before I discharged him. He had mild hypertension. His-blood pressure was running about 160 over 90 (160/90) at the time, that’s extremely mild for him, I would think. He complained, this was all subjective, he had a complaint of pain in the right lumbar area and over the lower ribs on the right side. When I would press on that side, he said it would hurt. However, I could press on the left side at a comparable location and he would say he had no pain and at the same time be pressing on the right and he would not complain of that pain. Now, pain like that, to me, is impossible to evaluate. I can not say that he did or he did not have pain, it is strictly on his statement. I will admit that healing rib fractures can cause residual pain for a good long while afterwards because of anatomical relationship with the nerves that run close to the ribs. He had, and he states that he has had — at one time he told me fifteen years and at another time ten years — for at least ten or fifteen years he has had a large right — I don’t say that he said it was large — but he said that he had a right inguinal hernia for that time. The first time I examined him it was quite large and the last time I saw him it was still large, I could not tell any difference in the size of it. He told me that when he originally had the hernia he wore a truss for awhile and then quit wearing it and that the hernia did not give him any trouble. When I discharged him, I think that his kidneys were entirely normal. However, he had quite a large prostate and which was large enough that it could be demonstrated on the intravenous phelo-gram, where the dye going down through the bladder and on out showed a displacement due to the large prostate. Now, chronic prostatitis in a patient Mr. Chamberlin’s age is not unusual. He did not ever mention having any pain in his perineal region or in the left side of his scrotum to me at that time. Now, I have seen Mr. Chamber-lin again, two or three days ago, and he tells me that he has had pain ever since he was in the hospital in the left side of his scrotum. He never did mention that to me while he was under my treatment. I will say this, I examined him very closely, particularly when I was looking at the hernia the last time in May and he did not have any swelling in the left side of his scrotum and he did not have any left inguinal hernia, which it still does not have, but on my last examination he does have quite a bit of swelling in the left side of his scrotum.”
On June 4th Dr. Williams addressed the following letter to, the. Maryland Casualty Company with regard to the plaintiff:
*369 “Maryland Casualty Company
“Louisiana National Bank Building
“Baton Rouge, Louisiana.
“Attention: Mr. Roberts
“Dear Mr. Roberts:
“Mr. Grady Chamberlin was discharged to return to work on May 29, 1953. He has no permanent disability. His IVP was normal and x-rays on May 29, 1953 of his ribs revealed healing.
“Very truly yours,
“(sgd) Chester A. Williams, Jr. M. D.”
It appears from Dr. Williams’ testimony that he examined plaintiff again on January 12, 1954 or two days prior to the trial of this case, and the result of this examination is' shown in his testimony as follows:
“A. His chief complaint when I saw him on the 12th was pain and swelling in the left scrotal sac. I examined this and I feel that he has — well it was, I am sure, quite tender because it was swollen and pressure on his epididymis and on the testicle was obviously painful to him. He says that he has had this, as I have stated, ever since he was in the hospital. I feel that he has a chronic epididymitis and orchitis and he may very easily have a spermatocele, it would be impossible to say without really operating to find out- — well you could aspirate it and if you got sperm back you would know, and I think it is entirely due to his prostate, that generally follows untreated prostatitis of the magnitude he -has prostate and I examined digitally and it is very large, at least twice its normal size. His hernia on the right side, as far as I can say is not any different to what it was before, size or the ease of reducing it, and he says it does not give him any trouble. In fact, the only trouble he told me he had when I saw him on the 12th was the pain in the left side of the scrotum. I did ask him if he had any residual pain in his right lumbar area and he said sometimes he got fleeting pains for two or three days, nothing severe, he told me. I examined his back and he bent over quite easily for this examination and I did not notice any spasm in his back muscles. Pressure over the lower rib cage though he said was painful.
“Q. Now, Doctor, which, if any, of these findings, that you have mentioned at the time that you discharged him on May 29th of last year do you attribute to the accident suffered by Mr. Cham-berlin in March of 1953? A. I would attribute pain over the right lower rib cage to the accident.
“Q. That was the pain you referred to as possibly resulting from the rib fracture that may go on for some while? A. That’s right.
“Q. And the other findings and complaints that existed at that time, you feel were due to other causes than the accident suffered by Mr. Chamberlin? A. Yes, sir.
ft * $ * * $ ‡
“Q. At the time of your last examination on the 12th of January this year, did you find anything that you attributed to Mr. Chamberlin’s accident in March, 1953? A. Only the subjective complaint of fleeting pains in the right lumbar area.
“Q. Is that of the same general type as that you have just mentioned as being possible residual pain from the healing rib fractures, at least that was your impression in May when you discharged him? A. No doubt that the rib fractures are completely healed, it may .be some residual pain following the healing, that’s impossible to say.
“Q. Assuming that there is such-pain as he complained of, do you consider it disabling to any extent? A. No, I would, not.
“Q. Now, you have mentioned this prostate troublq, is that in any way due to trauma or to tire accident suffered by Mr. Chamberlin? A. No, I do not *370 think that it is, .1 think that it just so happens that he' has a chronic pros-tatitis, which is infection of the prostate.-
“Q. And the swelling in the left scrotal sac, is that in any way connected with trauma ? A. The swelling in the left scrotal sac is, I feel sure, due to the prostatitis, is a residual of the prostatitis, which has not been treated.
“Q. Now, I believe you mentioned earlier in' your narrative report of your initial treatment of Mr. Chamberlin that a pyelogram was made on his kidneys or at least on his right kidney. A. This was an intravenous pyelogram and it would show both kidneys, the dye is concentrated in the kidney and excreted by the kidney and gives the pattern.
*t * ‡ * $ * ‡
“Q. I believe you stated, however, that the findings the pyelogram was negative ? A. It was negative insofar as the kidneys, ureter and the bladder was concerned but it did show the enlarged prostate.
. "Q. Did you find then at any time any evidence of kidney damage to Mr. Chamberlin during the entire time of your treatment or subsequent examination? A. No, I never did.
■« ¡¡c * * * * *
“Q. Now with regard to this hernia, I believe you stated that the hernia was incidentally noticed during the course of your treatment and it was related to you that it had existed from ten to fifteen years? A. That’s right.
“Q. Did you notice during the course of your treatment prior to discharge or at the time of your subsequent examination any change of any kind in the condition or position or severity of this hernia? A. I have never noticed any change.
“Q. Was there any difference in Mr. Chamberlin’s complaint or lack of complaint with regard to the hernia? A. No, at no time has he ever complained of the hernia to me.
“Q. Are you in position then to form any opinion as to whether or not this hernia was in any way affected or aggravated by the accident ? A. Well there is no way that I could say because I didn’t see him before the accident but if it-had been aggravated by the accident I think that he probably would have had pain at the site of the hernia.
“Q. Did he ever complain of any pain at the site of the hernia? A. No, he did not.
“Q. Did he complain of pain at the site of the hernia when you saw him on January 12th, 19S4? A. No, he did not.
“Q. At the time you discharged Mr. Chamberlin on May 29th of 1953, did you feel that he was then in a position to return to the same type of work that he had been performing before his accident? A. Yes, I did.
“Q. What about at the time of your examination in January of this year, do you feel that he is able to work? A. No, I don’t think he is now because I feel sure that that left testicle is quite painful to him. I don’t think he could get around very well, not until the rather acute phase of his epididymitis is over with.
“Q. And that I believe you say stems from the prostatitis probably? A. Yes.”
While Dr. Williams did not attribute any of plaintiff’s disability on the date of the trial to the injuries received as a result of the accident, it is well to note that he did report a complaint of the plaintiff to pain in the right lumbar area which could be attributed to some residual pain following the healing of the rib fractures. He did not believe that this pain was disabling to any extent.
It might be well to state before discussing further the testimony in this case that the plaintiff was not considered a malingerer *371 by any of the doctors, however,, some of them thought that in certain instances he was enlarging his complaints or showing greater evidence of pain than he really had.
Dr. Harris first treated the plaintiff on July 23, 1952 for a minor illness shortly after his arrival in Baton Rouge from Missouri. The first examination made by this doctor on Feb. 9, 1953 was a pre-em-ployment examination and it was at this time that he found the plaintiff had a “small right inguinal hernia” and he had very little or no symptoms as a result of this hernia at that time. In fact, he found no symptoms other than the hernia mass. It is shown that most doctors speak of hernias as being small, medium or large. Dr. Harris at that time noticed no other abnormalities such as were found by all the other doctors on the dates that they examined plaintiff. This doctor examined plaintiff again on January 8, 1954 shortly before the trial and testified as follows:
“A. On that examination he had a moderately large right inguinal hernia, and, in addition, he had tenderness, considerable amount of tenderness, in that region. It seemed that the pain and tenderness seemed to radiate to his back, and the hernia sac, as I say, of course, is moderately large now, and it' definitely is larger than it was on my first examination. In addition, he. had considerable muscle spasm in the lumbar region which I couldn’t explain at that time. Of course, I couldn’t say whether the hernia had anything to do with that or not. And he also complained of some pain' on movement of his body, such as bending, flexing and other movements. He also had some scattered enlarged lymph nodes in both inguinal regions, mainly being on the right side, and, of course, the significance of those, it is hard to say, I mean so many things could cause enlarged lymph nodes. With exception of that, I found him to be essentially in the same condition as he was on the other examination.
“Q. Did you notice any conditions, swellings or other similar condition around his body, upper part of his body?
“A. No, he had some enlarged lymph nodes in other regions of his body and maybe small nodular masses such as acne pimples and things of that kind. I didn’t notice too much other than that.”
Dr. Harris was of the opinion on the date of the trial that plaintiff could not do even light work that would require regular working hours. He stated that plaintiff could possibly do little jobs around the home. While this' doctor was not' familiar with the accident which the plaintiff had on March 23, 1953, on'the basis of a hypothetical question describing the accident and in which he was asked would the trauma suffered by plaintiff and happening in the general manner as outlined in the question, viz., where plaintiff was crushed between the two vehicles, “have any effect or be likely to have any effect on an existing hernia, he answered, “Well, yes, sir. There are lots of different beliefs concerning hernias, but we all think that they may become larger over a period of years, regardless of what you do, but certainly we know that any type of trauma or strain tends to aggravate hernias. If it doesn’t make them larger it tends to cause irritation and give them symptoms.” This doctor on cross examination stated that the muscle spasm which he found in the lumbar region was the result “of some back condition in his vertebrae.” He was of the opinion that the condition of this hernia which he found on January 8th, 1954 as well as the muscle spasm in the back would incapacitate plaintiff from doing any regular work. Dr. Harris definitely stated that he thought that the accident had a causal relation to the muscle spasm which he found in plaintiff’s back.
Dr. Vincent Mosely examined plaintiff on the 5th of June, 1953, and in testifying with regal'd to it he stated:
“Q. Would you state, in general, what you found on examination and *372 what report you made of your examination ? A. He told me that he had been injured on or about the 23rd of March, 1953, at which time he was pinned between some trucks. He stated that, in his own words, he was bruised on the inside and that they had to use the stomach pump for about three days. That he had one rib broken and another one fractured. That he was quite short of breath while in the hospital, that he coughed but didn’t cough up blood, they didn’t tap his chest. One kidney — this is still in his own words — one kidney was torn loose and had some blood in the urine for a few days subsequently. At the time that I saw him, as to how he felt at the time, he said that he wasn’t feeling well, he had chest pain, with a chronic cough, no blood, some dyspnea, said he was sleeping on a pillow. He had nocturia, that’s frequency of urination at night and also frequency during the day but he had not passed any blood since the first few days after the accident. He was thin, nervous, undressed with some difficulty and rather slowly. He seemed grossly anemic to me at the time. He coughed a good deal and smoked. His initial blood pressure was one hundred and seventy over 96 (170/96)-
“Q. Doctor, in what range is that? A. Slightly elevated. Subsequently his pressure was lower. I attributed that increase to some nervousness. It is not unusual for a patient’s blood pressure to be elevated the first time they come in and meet a strange doctor. I noticed that he had multiple swelling in the subcutaneous tissues, that’s nodes under the skin, distributed pretty well about his body, the one that seemed to be pertinent to the case is a swelling about 3 centimeters in diameter over approximately the eleventh rib posteri-orly. He was tender in this area and we could elicit some muscle spasm when we would feel this area. The ribs seemed to have healed pretty well by that time which was nearly three months after his accident when I saw him. He had an indirect reducible right inguinal hernia with the hernia presenting at his external inguinal ring. We noticed that he had a nodule in the left scrotum above the testicle. This nodule was about an inch in diameter. We felt that his prostate was slightly enlarged. We noticed one of the previously described soft tissue swellings in the perineum on the right side, this one was about three by two centimeters, that is a little over an inch each way. That was' the substance of my initial examination.
“Q. Doctor, in your report — do you have a copy of your report dated June 8th, 1953? A. Yes, sir.
“Q. You may have covered this, but I’m not sure. In that report it states that he, at that time, had some pain of a radicular type. Have you described that pain? A. Huh!
“Q. Do you recall finding any indications of pain of that type ? A. I said that the explanation of his pain which was in his right lower chest might be a radicular type pain due to irritation of the nerves by the fractured ribs which he had and that is the meaning of the word ‘radicular’ pain, and I suggested that it might be worth while to do a few nerve blocks on him to see if he obtained any benefit from it.
“Q. Doctor, at the time of that first examination, how would you classify the hernia with reference to size ? I am speaking of its size as of the time of your first examination. A. It would be described as being a small reducible indirect right inguinal hernia.
“Q. Did you consider that he was able to do manual labor at the time that you examined him the first time, June 5th? A. At that time, I thought that he shouldn’t work, at least until the whole clinical picture was completed because I thought some of his complaints were not particularly connected with the injury and some were. I thought he needed an investigation concerning it. I quote from the letter: *373 'This man is not able to work. at the present time. Obviously all of his complaints however are not traumatic in ■origin. Further investigative work is needed before a more exact opinion can be given. This is necessary in my opinion not only from a medico-legal viewpoint but also from the viewpoint of the patient’s welfare.’ ”
It is shown that Dr. Mosely saw the plaintiff on the 19th, 20th, 27th and 30th of June, as well as on the day .of the trial, January 14, 1954. He was questioned and gave the following answers with regard to his examinations on those dates:
“Q. On any of tho.se occasions, Doctor, in your opinion was he able to do manual labor without endangering his health or without causing undue pain? A. Huh! Well, he has many things wrong with him and we told him that he should have his prostate checked before attempting to return to work; we told him that he should have the chest examination completed with bronchoscopic examination and to settle whether or not he does have definitely bronchiecrasis with bronchography; his hernia is small and whether or not an individual can work with a hernia, in many instances it is up to them. Now his fractured ribs, I feel are healed by this time. Now these multiple nodules that he has, I believe are multiple neurofibromatos, these are benign tumors of the nervous and fibrous tissue origin of which he has quite a few about his body. The first time I saw him I was a little undecided as to whether the pne in the region of the fracture site represented traumatic fat necrosis or whether or not it was a neurofibromato. To clarify the matter, I suggested that we remove this particular nodule and have it examined microscopically, if it were a neu-rofibromato the diagnosis, would be confirmed and if it were traumatic fat necrosis this particular area of irritation would be removed for further consideration and examination. Now, the investigation of his urinary tract has been deferred, I believe due, to financial reasons, to a more suitable time. * * *
“Q. Now, .Doctor, what .did you, find * * * ■ A. ■ Excuse me. (continuing) * * * I recommended that this nodule be excised,, that this mass in his left scrotum be removed, that his hernia be repaired and we considered .bronchoscoping him and also that he should be cystoscoped.
“Q. What did you find today, Doctor, on your examination? A. He still has his hernia which is a reducible hernia. He still has today the multiple subcutaneous nodules. He still has tenderness and spasm in the region of- the previously described nodule over the lower right chest posteriorly.
“Q. It that in the area of the fractures ? A. Yes, that is adjacent to that.
“Q. -Js that latter condition consistent with his previous trauma or reasonably possible to be related to that trauma? A. The nodules?
“Q. No, the muscle spasms and the pain, tenderness that you spoke of last. A. Well, muscle spasm, although widely used in medical-legal testimony is rather a difficult thing to define, that is the exact amount of the component that is voluntarily and the exact amount that is involuntarily. So in many instances it is. very difficult to say exactly which predominates. As far as his ribs are concerned, I feel that they are healed as far as we could tell by x-ray and they are not a particular factor in whatever disability he might have at the moment.
“Q. Doctor, assuming that this man was working for a construction company, working on a road using a shovel that required physical exertion of that general type, stooping and bending, and employment five days a week for eight or nine hours a day, would you consider him able at this time to do that sort of work? A. Well, it depends upon whether or not one considers a man with a hernia should work at all after a hernia is discovered, That is one very tangible thing that we do have. Perhaps there are certain types of light duty that he could do, but in addition to these things which are directly connected with his injury, he does have the other findings too, which I think contribute to. the general picture. . ■
*374 “Q. Well, at the moment not attempting to attribute to any particular condition, any particular degree of inability to work, but in the condition that you now find him, in your opinion can he or can he not do manual labor without pain or without it injuring his health or life of the sort of labor that I described? A. That is very hard to say because a lot of it just depends upon the patient’s will to work and then, too, some factors that would make him feel bad were not connected with his injury.”
On cross examination Dr. Mosely gave a summation of his findings on his examination of June Sth as shown in a report of June 8th. He stated these to be fractured ribs on the right side of his chest; a right inguinal hernia; soft tissue in the subcutaneous tissue of plaintiff’s body, and he-mentioned a differential diagnoses of traumatic fat necrosis, neurofibroma and lipoma which should be considered but stated that his personal impression had been that they were neurofibromata; prostatic hypertrophy ; hypertension and left spermatocele. The only additional condition which he thought plaintiff might have had after his examination óf June was bronchiectasis. Dr. Mosely was then asked which of the things listed he attributed to 'the accident and which he attributed to causes unrelated to the • accident. He attributed plaintiff’s fractured ribs to the accident. The others were unrelated. Dr. Mosely stated that the plaintiff had made a satisfactory recovery from the fractures of his ribs but stated plaintiff still had some pain' which might persist “for several weeks afterward” but ‘ that as a rule it was not disabling. He also testified that Mr. Chamberlin’s hernia was practically the same on the date of the trial as it was in June 1953 when he examined him. Dr. Mosely positively testified on the assumption that plaintiff had had his hernia for some time and had been working prior to and at the time of the accident with the hernia; that in his opinion there .was nothing on the date of the trial nor in June when he last saw plaintiff resulting from the accident which disabled him.
Dr. Duane Forman, an expert in neurological surgery, testified as a witness on behalf of the defendants but was complimented by counsel for both plaintiff and defendant. Dr. Forman had examined plaintiff on August 25, 1953 and the second and last time on January 12, 1954, and between those two times had talked with him twice in his office. As to his examination of August 25, 1953 he testified:
“A. Well on that examination I got the history of his injury in March 1953 from him and from his wife who was present, and I was told he was caught between two trucks and suffered a crushing injury and he was confused for several days after that. He was admitted to the hospital. As a result of that injury he had severe pain in the low back, most on the right side, the right, hip, spreading around into the right groin and pain in the left scrotum. He had continued to have periods of confusion — These are residual symptoms, I won’t go into his. hospitalization that they told me about, said; he had been in the hospital and been released later. He had several fractured ribs, and since leaving the hospital he had continued to have pain as described; periods of' confusion and ataxia or unsteadiness of gait; weakness and tremulousness of his. right arm; occasional headache; deafness, and ringing in his right ear, some deafness, in his left ear. They mentioned incidentally that the impaired hearing in his right ear-had existed'prior to the injury but was or had become much worse since the injury.. The rest of these symptoms had been noticed since the injury and they claimed that these symptoms were gradually getting-worse. On examination, he was dulled, I thought, mentally, slow in his reactions and' in his responses to examination. He was.' partially deaf, his deafness was apparently complete in the right ear, partial in the left ear, and to testing with a tuning fork the deafness was of a nerve type rather than due to involvement of the ear drum, middle-ear.
“By The Court:
“Q. Was that so as to both ears, Doctor?1 A. Yes, sir, in both ears. He had impairment of sensation to all types of stimulation, including pain, touch, vibration, position;. *375 over the entire right half of his body, including his head and face and he had an almost absent right corneal reflex, that is failure to blink the eye when the eye ball is touched with a piece of cotton, however it was normal on the left side. He had a marked action tremor and clumsiness of the use of the right upper extremity with inability to control the extremity in reaching for objects and he would pass a point or miss the goal quite a distance. He had unsteadiness of gait using a wider base than normal in walking, being unable to walk a line, heel to toe, without wavering or falling to the right. He kept his spine tilted to the right and bent slightly forward and was unable to move his low back in any direction to extremes without suffering pain in the low back. He had tenderness to pressure over the right side of the low back from the level of about the second to last rib all the way down to the mid-buttock and this tenderness extended around the top of his pelvis on the right and into the right lower abdomen. There was a tender, swollen left epididymis and he had multiple subcutaneous nodules and masses which were found primarily over the trunk and upper extremities, where the largest area that he stated was involved by the crushing injury. These nodules varied in characteristics some of them were firm and not freely moveable in all directions, others were soft, particularly the ones around the trunk and freely moveable.
“Q. Now, from all that what diagnostic impression did you make? A. I thought he had symptoms and signs of damage to his eighth nerves, eighth cranial nerves, the right being most involved. Damage to the right fifth cranial nerve and to the right cerebellar hemisphere. Sprain of his spine at the dorsolumbar junction with secondary neuralgia of the twelfth thoracic and first lumbar nerves on the right side. Multiple neurofibromatosis or von Recklinghausen disease, is the name of it, and left epididy-mitis. Incidentally, he gave me the history of his hernia on the right side, I didn’t examine that. My impression just to sum it up, was that he had the .signs of an intra-cranial tumor in the right posterior, fossa of the skull, which is the very back of the .skull which would involve these cranial .nerves and his cerebellum and cause the disturbance in his right upper extremity, his' unsteadiness of gait, occasional headaches, periods of confusion perhaps, and that he had suffered a sprain of his spine as result of his injury and was still suffering from residual chronic neuralgia of the nerves that leave the spine at that level. That he had an epididymitis. There were x-rays that were made that revealed no damage to the spine itself but did reveal fractured ribs. Those were my impressions at that time.” (Emphasis added.)
. After the above quoted testimony Dr. Forman was asked the following question:
■ “Q. You have mentioned, I believe, some ■four particular findings — the evidences of the tumor; the neurofibromata or von Reck-linghausen disease; three, the neuralgia, and fourth, the epididymitis — which, if any of those could you trace as possibly having any relationship to the accident related by the patient .as having occurred in March 1953 ? A. Just the neuralgia.”
Dr. Forman’s testimony, as stated in defendant’s brief, “.though essentially lengthy, is exceedingly logical and well-reasoned, the doctor going into detail to explain the reasons for each of the .opinions reached by him.” Dr. Forman in testifying with regard to the neuralgia of the back stated:
“Q. Now, you have mentioned also your opinion of a chronic neuralgia of the twelfth thoracic and first lumbar nerves, secondary to this back sprain, is that a disabling condition, that is, the extent to which you found that present at the time you sáw Mr. Cham-berlin? I am speaking now of August of last year. A. Yes, the neuralgia is disabling, at times it can be disabling. It often is for long periods of time. The evidence that a person has such neuralgia is always subjective unless there is marked muscle spasm in the back, and then in cases of chronic neuralgia, ones that have persisted over long periods of time, muscle spasm in the back has usually subsided.
*376 “Q. What did you find in the way of muscle spasm in Mr. Chamberlin’s back in August? A. I didn’t find any on my first examination but as I say, thé condition doesn’t usually manifest itself with objective signs, so its impossible to establish the diagnosis with no proof. Subjective signs though are usually convincing if they follow discreetly in the pattern of nerve roots that are supposed to be involved and his did follow that Pattern. He had typical radiation of pain and typical distribution of tenderness that go with the involvement of nerve roots, which I mentioned. (Emphasis added.)
“Q. Is such a condition considered to be permanent at all, Doctor? A. Well, without any fracture or dislocation of the spine at the level involved the condition is cor-rectible with proper treatment; never has to be permanent if treated properly.
“Q. Is it a common condition you find, Doctor, or uncommon ? A. Very common. It is the commonest kind of back trouble.
“Q. That’s the usual experience insofar as duration? A. I have seen people that have had it for years, usually not severe but at least enough to bother them for many years; sometimes it can be disabling for a year or more intermittently, people tend to have it in severe bouts, partially recover and have others bouts, depending on their activity but it can be disabling in regard to physical work over a period of years if it is not corrected by proper treatment, and in those people where it lasts for so long there is usually some postural fault of the spine, some deformity of the spine that prolongs symptoms indefinitely.”
Dr. Forman was of the opinion that the neuralgia which he believed to be present in the plaintiff’s back as a result of the sprain received in the accident on the date of the trial was still disabling insofar as performing actual physical labor was concerned, in fact, he stated: “But I doubt if he would be able to perform duties that require any appreciable bending, stooping, lifting, climbing with what he apparently has disturbing him in the way of neuralgia now.” Dr. Forman felt that with proper treatment the neuralgia could be cleared within a period of a month or two so that he should not have any permanent disabling residuals. One phase of the treatment he outlined was the blocking of the nerve trunks involved which was referred to by Dr. Harris.
In addition to the doctors’ testimony, there is lay testimony to the effect that plaintiff had performed manual labor satisfactorily prior to the injury, and his various ailments had not been noted prior thereto. He freely admitted and it is shown by the record that he was not troubled by the hernia prior to the accident nor after the accident, although he had had it for many years. He did suffer from deafness in his right ear prior to the accident.
We are of the opinion that the only disabling result of the accident proven by plaintiff is an injury in the region of his back, as termed by Dr. Forman’s testimony, neuralgia of the back. All the doctors found muscle spasm, sprain and tenderness in this region and also considering the lay testimony that prior to the accident he had been able to do manual labor, we find that he is totally disabled and that the judgment should be affirmed in this respect.
On the question of penalties, we believe the Lower Court’s refusal was correct. It is definitely shown that compensation was discontinued upon the written advice of Dr. Williams on May 29, 1953. Probably in the abundance of precaution but without any change in plaintiff’s condition or diagnosis insofar as any-doctor is shown to be concerned, compensation was resumed and paid until October 19, 1953, when it was again discontinued. Defendant’s insurance company stated it was discontinued upon the basis of Dr. Forman’s letter to Dr. R. C. Llewellyn of September 14, 1953 which reads as follows:
*377 “Dr. R. C. Llewellyn
“Department of Surgery
“Tulane Service
“Charity Hospital
“New Orleans, La.
“Dear Dr. Llewellyn:
“This letter will serve to introduce Mr. Grady Chamberlin, a fifty-two-year-old resident of Baton Rouge, who is in need of hospital admission for neuro-surgical work-up.
“Mr. Chamberlin was referred to me recently by the Maryland Casualty Insurance Company for neurological examination and opinion concerning residual damage from an injury he suffered in March of this year. At that time he received a crushing injury to the upper abdomen and lower chest when he was caught between two trucks. He suffered fractures poster-iorly of the 7th and 9th ribs and laterally of the 7th and 8th ribs. X-rays were otherwise negative. Though there was no history of trauma to the head he displayed intermittent confusion for several days following the injury. As a result of the trauma he developed what I considered a neuralgia of the twelfth thoracic and first lumbar nerves secondary to dorso lumbar sprain. Other symptoms, which I will mention below, have been attributed to the accident by the patient and his family though there is little likelihood any relationship exists.
“There is a history of bilaterial partial deafness, worse on the right with persistent tinnitus in the right ear; intermittent periods of mild confusion and impaired memory; occasional bouts of gross ataxia of gait; weakness and tremulousness of the right upper extremity; occasional occipital headache. According to the family, all these, symptoms have arisen since the injury except for previously existing slight deafness., They also claimed that multiple subcutaneous nodules have appeared since the injury. The patient and his family stated that these-symptoms are increasing gradually in severity.
“On examination the patient presents slight dulling of mental function; a right fifth nerve deficit, bilaterial deafness, partial on the left and apparently complete on the right and apparently nerve type; impairmént of sensation of all modalities over the entire right side of the body; weakness, action tremor, sysmetira, and adiacochokines-is of the right upper extremity; moderate ataxia of gait with deviation t.o the right; multiple subcutaneous neu-rofibromata; and tenderness over the distribution of the right twelfth thoracic and first lumbar nerves with discomfort in the distribution of these nerves, and in the upper lumbar spine on movements of the trunk.'
“My initial impression was that he might very well have an acoustic neu-rinoma, possibly bilaterial. X-rays of the skull revealed no evidence of erosion within the area of the internal auditory canals or petrous tips. They did reveal, however, a diffuse osteos-clerosis and minimal thickening to be present in the interior portion of the occipital bone bilaterially. This Sclerosis also appeared to extend up into the .floor of the middle cranial fossa. The increased density of the floor of the middle fossa appeared to be slightly greater on the right than on the left. Dr. Geheber, the radiologist who reviewed the films, was of the impression that the changes on x-ray suggested Paget’s disease of the bone, with production of sclerotic bone being a predominating factor. A fibrous dysplasia of bone was also considered. He thought that there was slightly increased density of the entire cranial vault, which would be consistent with . an early Paget’s . disease.
“I feel that the presence of a cere-bellopontine angle tumor, particularly neurinoma, must be strongly considered.
*378 “The patient is referred to 'Charity Hospital since the Insurance Company would not be responsible for financing studies and treatment directed toward an intracranial condition not related to his accident.
“If I can afford any further information, please let me know.
“Sincerely yours,
“Duane Forman, M.D;
“DF; hb '
“cc: Maryland Casualty Co.
“Mr. Ben Miller, attorney”.
In this letter it will be noted that Dr. Forman stated. “As a result of the trauma he developed what I considered a neuralgia of the twelfth thoracic and first lumbar nerves, secondary to dorsolumbar sprain.” This is the only reference made to the so-called neuralgia of the back which Dr. For-man later on the trial of the case testified was disabling to plaintiff. In this letter Dr. Forman does not state his opinion with regard to this neuralgia but merely that plaintiff developed it as a result of the accident.
The testimony of a representative of the defendant insurer is to the effect that other than the medical reports of Dr. Williams, Dr. Mosely, and one of Dr. Forman as well as two reports of Dr. Harris, he had no other additional medical information at the time the compensation to plaintiff was suspended in' October. Based upon these facts, the discontinuance of compensation payments to plaintiff on October 19, 1953 was not unreasonable or capricious.
Although plaintiff in his answer to the appeal has asked that the judgment be amended by increasing the amount of the unexpended medical allowances from the sum of $562.81 to the sum of $632.81, based upon proof that $60 of the medical expenses charged by the defendant insurance company against this medical benefit allowance was related solely to examinations by its expert witness. Counsel nowhere in his brief argues this point, nor does he argue his request that the unexpended medical allowances be awarded in a lump sum instead of reserving to plaintiff his right to-subsequently sue for this amount.
On the first proposition the prayer of plaintiff’s petition asks for judgment for total disability less credits for compensation already paid “together with the additional sum of Five Hundred Sixty-two and 81/100-($562.81) Dollars, being the maximum medical allowance of One Thousand and no/100-($1,000.00) Dollars allowable under the Workmen’s Compensation Law of Louisiana, less medical payments totalling Four Hundred Thirty-seven and 10/100 ($437.10)-Dollars previously made * * * ”
The judgment of the District Court gave-plaintiff exactly what he asked for, a credit of $437.10, leaving him a right if necessary to sue for the unexpended balance of $562.81, (Which should be $562.90).
On the other hand the defendant contends-that he- protected his position by timely objecting to the enlargement of the pleadings by the introduction of any evidence going beyond the allegations of plaintiff’s petition in regard to an increase of the unexpended statutory medical allowances awarded' to-plaintiff. In addition, however, defendant contends that the amount of unexpended statutory medical allowances should be reduced to $532.81 instead of $562.81 as awarded in the judgment. As stated in defendant’s brief: “ * * * The legal point in dispute as regards the respective contentions of plaintiff and defendants here revolves around whether or not the $60 expended by Maryland Casualty Company in connection with referring plaintiff to Dr. Forman is or is not properly ‘chargeable against the statutory allowance. It was brought out at the trial that plaintiff was referred to Dr. Forman for neurological examination in view of Dr. Mosely’s report that there may be some nerve type pain which should be treated by nerve blocks if it did not disappear shortly. It should also be noted that at the time that defendants referred plaintiff to Dr. Forman, compensation was being paid and no suit had *379 been filed. At tbat time plaintiff was not receiving any treatment of any kind from any physician. . Certainly it can not be said that defendants were merely preparing their case for trial rather than seeking to promote plaintiff’s physical welfare in referring him to Dr. Forman, and in incurring the expense of Dr. Forman’s examination and the X-rays made in connection therewith. It is submitted that certainly these expenses were incurred in good faith and are properly chargeable against the statutory medical allowance of $1,000. Defendants should therefore be allowed a credit of $467.19, and the unexpended balance to which plaintiff makes claim reduced to $532.81.”
The defendant’s position is correct and without Dr. Forman’s reports and testimony plaintiff’s case might not be certain. The judgment appealed from is amended by reducing the unexpended medical allowance to $532.81.
The additional point raised by plaintiff-appellee in his answer to the appeal that this unexpended allowance should be paid to plaintiff in a lump sum in view of the showing that additional medical treatment is necessary is not well founded. There is no argument on this point in plaintiff’s brief. The neuralgia in the back is the only disabling injury received by the plaintiff as the result of the accident and he would only be entitled to sue for any unexpended medical allowances in order to receive treatment of this particular injury or ailment. There is nothing in the record that even suggests plaintiff desires or desired any further treatment of this ailment. The district court properly decided the question under the authorities cited in his opinion, viz., Bynog v. Mansfield Hardwood Lbr. Co., La.App., 4 So.2d 837; Boykin v. We Hope Gas & Oil Co., La.App., 2 So.2d 528.
We are therefore of the opinion that the judgment of the District Court should be amended by reducing the unexpended medical allowance to $532.81 and as amended the judgment of the District Court is affirmed at defendants’ costs.